**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| **BORDER STATES INDUSTRIES, INC.**<br>2400 38th St. S.<br>Fargo, North Dakota 58104<br><br>Plaintiff<br><br>**v.**<br><br>**DARANA HYBRID, INC.**<br>903 Belle Avenue<br>Hamilton, Ohio 45015<br><br>SERVE ALSO:<br>Cogency Global Inc., Registered Agent<br>248 E. Capitol Street, Suite 840<br>Jackson, MS 39201<br><br>and<br><br>**DESCO, LLC**<br>2611 W. Oxford Loop<br>Oxford, MS 38655<br><br>SERVE ALSO:<br>Cogency Global Inc., Registered Agent<br>248 E. Capitol Street, Suite 840<br>Jackson, MS 39201<br><br>and<br><br>**JOSEPH "JAY" GALL**<br>806 Maplewood Drive<br>Oxford, MS 38655<br><br>Defendants. | Case No. 3:25-CV-148-MPM-JMV<br><br>Judge ____________________<br><br>**COMPLAINT**<br><br>**(JURY DEMAND ENDORSED HEREON)** |

For its Complaint against Defendants Darana Hybrid, Inc. ("Darana"), DESCO, LLC ("DESCO"), and Joseph "Jay" Gall ("Mr. Gall" and together with Darana and DESCO, the "Defendants"), Plaintiff Border States Industries, Inc. ("Border States") states as follows:

## THE PARTIES

1. Border States is a North Dakota corporation with its headquarters in North Dakota. Border States, which is registered to do business in Mississippi, distributes electrical products and materials for the construction, industrial, and utility sectors. It offers electrical boxes, cabinets, motor controllers and peripherals, wires and cables, light bulbs, lighting fixtures, switches, and much more. Border States also provides cable management, automation and control, supply chain, technical support, and other services.

2. Darana is a Tennessee corporation with its headquarters in Hamilton, Ohio. Darana is an international electro-mechanical contractor with expertise in the food and beverage, distribution and fulfillment, and material handling industries.

3. DESCO is a Tennessee limited liability company with its principal place of business in Atlanta, Georgia. Upon information and belief, DESCO's sole member is Darryl Cuttell, an Ohio resident.

4. Mr. Gall is an individual residing in Oxford, Mississippi.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332. Border States and the Defendants are citizens of different states and the amount in controversy is more than $75,000.

6. This Court has personal jurisdiction over the Defendants because their actions in Mississippi have given rise to the claims at issue.

7. Venue is proper under 28 U.S.C. § 1391(b)(1) & (b)(2).

## FACTUAL BACKGROUND

### A. The Agreement.

8. On August 19, 2020, Sequel Electrical Supply, LLC, which later merged into Border States and now operates under the fictitious name of Sequel Electrical Supply, A Division of Border States ("Sequel") (*see* Section C below), entered into a Consignment Agreement (the "Agreement") with Darana. A copy of the Agreement is attached as **Exhibit A**.

9. As reflected in the Agreement, Sequel intended to sell electrical parts and equipment to Darana and such goods (the "Consigned Goods") were stored at a warehouse facility owned by Darana located at 903 Belle Avenue, Hamilton, Ohio 45015.

10. Pursuant to the Agreement, title to the Consigned Goods remained with Sequel until Darana used the goods, at which time title transferred to Darana and triggered Darana's payment obligation. *See* Agreement, Articles 1 and 4.

11. A portion of the Consigned Goods included special items not typically warehoused by Sequel; those goods are defined as "Special Items" under the Agreement. *Id.*, Article 2.

12. Prior to using any Consigned Goods, Darana was always free to return goods to Sequel unless they were Special Items.

13. If Darana wanted to return any Special Items, the Agreement required Sequel to facilitate the return of the Special Items to the original manufacturer. If the manufacturer agreed to accept the return of Special Items, the Agreement required Darana to pay for all shipping and restocking fees. If the Special Items were not returnable to the manufacturer, then the Agreement required Darana to pay "for the Special Items based on the consigned quantity and the agreed upon price." *Id.*, Article 2.

14. Despite not being a party to the Agreement, DESCO frequently placed orders with Sequel for the delivery of Consigned Goods. Sequel then delivered those Consigned Goods to DESCO (at the same Ohio address as Darana). Once DESCO used the Consigned Goods, Sequel would invoice DESCO and it would pay Sequel for the Consigned Goods.

**B. Mr. Gall Leads the Outside Sales Team that Does Business with Darana and DESCO.**

15. Mr. Gall was a key member of Sequel's Outside Sales Team in the company's Oxford, Mississippi office.

16. In his outside sales position, Mr. Gall, among other things, identified and established contact with potential customers, scheduled and performed product demonstrations with potential customers, developed and maintained relationships with existing customers, attended industry trade shows to identify potential sales leads and make meaningful contact with existing customers, followed industry trends to identify new opportunities for potential sales, and directed sales representatives in an effort to achieve sales goals.

17. As part of his job responsibilities, Mr. Gall exercised significant influence over Sequel's existing customers and the agreements—like the Consignment Agreement—that Sequel formed with them.

18. As part of their relationship, Sequel placed a special amount of trust and justifiable confidence in Mr. Gall and relied upon him in connection with the above referenced responsibilities.

19. Moreover, Sequel granted to Mr. Gall, and Mr. Gall exercised, certain authority to act on Sequel's behalf.

20. While at Sequel, Mr. Gall directed other sales representatives, many of whom did business with Darana and DESCO, pursuant to the terms of the Agreement.

21. Throughout his employment with Sequel, Mr. Gall created strong business and personal relationships with many employees at Darana and DESCO.

22. Mr. Gall controlled and was responsible for reordering items for Darana and DESCO and assisted with establishing Sequel's pricing offered to Defendants and minimum and maximum sales volumes.

**C. Border States Acquires Sequel.**

23. In August of 2023, Border States reached an agreement to purchase Sequel.

24. On or about September 7, 2023, Border States confirmed the acquisition when it filed a Certificate of Merger with North Dakota's Secretary of State. A copy of the Certificate of Merger is attached as **Exhibit B**.

25. Following the acquisition, Sequel operated as a division of Border States and many of Sequel's former employees, including Mr. Gall, became employees of Border States.

**D. Soon After the Acquisition, Mr. Gall Leads the Mass Exodus of Employees from Sequel to DESCO's New Oxford, Mississippi Office (which Mr. Gall Formed and Opened).**

26. As explained above, Mr. Gall and the sales team worked closely with Darana and DESCO.

27. Among that team was an individual named Whitney Hall ("Ms. Hall").

28. Ms. Hall announced her departure from Sequel on February 9, 2024, and joined DESCO, one of Sequel's competitors.

29. Prior to her departure, Mr. Gall knew that Ms. Hall was leaving Sequel for DESCO.

30. In fact, Mr. Gall sent emails and other business opportunities to Ms. Hall's DESCO email address prior to her departure from Sequel. Representative examples of these emails are attached as **Exhibit C**.

31. And yet, when Ms. Hall tendered her resignation letter to Sequel, Mr. Gall forwarded the letter to, among others, DESCO's owner, Darryl Cuttell, saying: "Whitney is no longer a team member at Sequel Electric. She has decided to move into another direction. She will be missed but please take her off of all emails that need to come to Sequel Electric for any projects you have going on." A copy of this email is attached as **Exhibit D**.

32. When Mr. Gall forwarded the resignation letter, Mr. Cuttell already knew that Ms. Hall had left Sequel to join his company, DESCO.

33. Following her resignation, Mr. Gall continued to forward emails and other business opportunities to Ms. Hall at DESCO. Representative examples of these emails are attached as **Exhibit E**.

34. For an extended period of time, prior to his resignation from Sequel, Mr. Gall was actively working for DESCO; he even facilitated the opening of an Oxford, Mississippi division of DESCO.

35. DESCO's new Oxford, Mississippi office was intentionally set up in close proximity to Sequel's business (less than four (4) miles away) to enable DESCO to establish a presence in Oxford to directly compete with Sequel from this location.

36. In fact, prior to his resignation from Sequel, Ms. Hall submitted an expense report on Mr. Gall's behalf to DESCO seeking reimbursement for his expenses incurred in connection with the "Oxford Building" of DESCO. Mr. Gall then asked an individual affiliated with Darana (with a copy to Mr. Cuttell) to "hold this until next week when I'm on the pay roll [sic] . HAPPY TIMES[.]" A copy of this email is attached as **Exhibit F**.

37. Perhaps worse, prior to his formal resignation from Sequel, Mr. Gall registered DESCO to do business in the State of Mississippi and listed himself as its President. A copy of DESCO's foreign entity registration is attached as **Exhibit G**.

38. Two days later, on February 23, 2024, Mr. Gall announced his resignation from Sequel.

39. Following Mr. Gall's resignation, the following employees left Sequel for DESCO: Hendon Ervin (2/23/2024), Cynthia Mills (2/26/2024), Russell Greene (2/26/2024), South Oakes (2/26/2024), William Hoseman (3/7/2024), and Rusty Bolger (3/8/2024).

40. Indeed, with the departures of Ms. Hall, Mr. Gall, Mr. Ervin, Ms. Mills, Mr. Greene, Mr. Oakes, Mr. Hoseman, and Mr. Bolger, eight (8) of the thirteen (13) total employees at Sequel's Oxford, Mississippi location left Sequel to join the newly-formed DESCO branch and directly compete with Sequel for its business.

41. These individuals held a variety of positions at Sequel, including sales, customer service; administration; and driving.

42. Following these departures, Sequel's Oxford, Mississippi division sales decreased substantially, and a few significant accounts moved to DESCO, due in large part to the intentional breach of the Agreement discussed below.

**E. Darana Intentionally Breaches the Agreement.**

43. Pursuant to the Agreement, Border States delivered Consigned Goods to Darana and DESCO.

44. On May 2, 2024—following the resignations of Mr. Gall, Ms. Hall, and the six (6) other Sequel employees—Darana and DESCO unexpectedly returned certain Special Items to Sequel (the "Returned Goods").

45. Based on the timing and sequencing of the above-described events, it is believed that Mr. Gall orchestrated a deliberate scheme in which he intended to cause harm to Sequel and/or Border States: First, Mr. Gall secured his own employment with DESCO; Second, while still employed by Sequel, Mr.Gall established DESCO to directly compete with Sequel in Oxford, Mississippi; and Third, Mr. Gall lured, recruited, and convinced most of Sequel's existing employees to join him at DESCO.

46. Once these elements of the scheme came to fruition, and DESCO's competing Oxford location was up and running, it is believed that Mr. Gall induced and/or caused Darana and DESCO to breach the Consignment Agreement in order to undercut Sequel's pricing.

47. It is believed that, rather than use its existing consigned inventory pursuant to the terms of the Consignment agreement, Defendants breach such agreement by returning inventory including Special Items and then using Sequel's confidential and proprietary pricing and purchasing information provided by Mr. Gall and the other employees Defendants poached to purchase the same materials directly from the manufacturers.

48. Although Darana returned a portion of the consigned inventory, it continued to store other Consigned Goods, including some Special Items.

49. Border States then attempted to facilitate the return of the Returned Goods to their manufacturers.

50. Some of the Returned Goods were not returnable, others were, and some items were returnable if certain conditions were met. A chart that tracks the returnability of the Returned Goods is attached as **Exhibit H**.

51. Border States invoiced Darana for the Returned Goods. A copy of the Invoice for the Returned Goods that are returnable is attached as **Exhibit I**. A copy of the Invoice for Returned

Goods that are not returnable is attached as **Exhibit J**. A copy of the Invoice for Returned Goods that are returnable with conditions is attached as **Exhibit K**.

52. Darana has refused to pay the invoices.

53. Moreover, Border States has also incurred monthly storage fees totaling at least $30,000.00 to store the Returned Goods.

54. The Agreement provides that Border States is entitled to recover all damages resulting from Darana's breach of the Agreement, including without limitation all "costs, expenses and reasonable attorney's fees." Exhibit A, Agreement, Article 13.

**COUNT I – BREACH OF CONTRACT**
**(Darana)**

55. Border States incorporates each and every allegation above as if fully restated herein.

56. The Agreement is a valid and binding contract between the parties.

57. Border States performed any and all of its obligations under the Agreement.

58. Darana, however, has failed to perform its obligations under the Agreement by, among other things, failing to make the requisite payments thereunder.

59. As a result, Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

60. As a result, Border States is also entitled to an order awarding reasonable costs and attorneys' fees pursuant to Article 13 of the Agreement.

**COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Darana)**

61. Border States incorporates each and every allegation above as if fully restated herein.

62. Under Mississippi law, a covenant of good faith and fair dealing is implied in every contract.

63. Border States and Darana entered into the Agreement, which constitutes a valid and binding contract.

64. Under the Agreement, there was an implied covenant of good faith and fair dealing and, as a result, Darana had a duty to do everything necessary to carry out the terms of the Agreement.

65. Darana's actions as described herein, including its deceptive scheme of using Sequel's employees to establish a competing business in Oxford, Mississippi to facilitate cutting Sequel out of its sales under the Consignment Agreement by using Sequel's confidential and proprietary information and the majority of its employees, constitute a breach of the implied covenant of good faith and fair dealing.

66. As a result, Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**COUNT III – UNJUST ENRICHMENT**
**(Darana and DESCO)**

67. Border States incorporates each and every allegation above as if fully restated herein.

68. Border States conferred a benefit upon Darana and DESCO.

69. Darana and DESCO knew of the benefit.

70. Under the circumstances, it would be unjust to allow Darana and DESCO to retain the benefit without payment.

71. As a result, Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**COUNT IV – BREACH OF FIDUCIARY DUTY**
**(Mr. Gall)**

72. Border States incorporates each and every allegation above as if fully restated herein.

73. From February 2006 to February 23, 2024, Mr. Gall was employed by Sequel and held significant client-facing positions.

74. As a key employee for Sequel, Mr. Gall, *inter alia*, identified and established contact with potential customers of Sequel, scheduled and performed product demonstrations with existing and prospective customers of Sequel, developed and maintained relationships with existing customers of Sequel, attended industry trade shows to identify potential sales leads and make meaningful contact with existing customers of Sequel, followed industry trends to identify new opportunities for potential sales, recruited and managed teams of sales representatives, and directed sales representatives so as to achieve sales goals.

75. Indeed, Sequel placed a special amount of trust and justifiable confidence in Mr. Gall to preserve and protect its client relationships, business interests, goodwill, and proprietary and/or confidential information.

76. Moreover, Sequel granted to Mr. Gall, and Mr. Gall exercised, certain authority to act on Sequel's behalf.

77. As a result of the above, Mr. Gall held a fiduciary relationship with Sequel.

78. Mr. Gall, however, breached his fiduciary duties to Sequel by, *inter alia*, engaging in multiple intentional acts of disloyalty, including but not limited to the following:

a. Sending emails reflecting Sequel's proprietary business information to DESCO and unfairly collaborating with Darana and DESCO prior to his resignation from Sequel;

b. Diverting significant business opportunities from Sequel to DESCO beginning prior to his resignation from Sequel;

c. Planning, conspiring, and plotting to leave Sequel's employment during company time and using Sequel's resources to recruit other Sequel customers and employees to leave Sequel and join Mr. Gall at DESCO;

d. Registering DESCO to do business in Mississippi and listing himself as its President prior to his resignation from Sequel;

e. Prior to his resignation, coordinating the opening of a new DESCO office in close proximity to Sequel in Oxford, Mississippi to compete with Sequel;

f. Improperly retaining and using Sequel's pricing information and customer lists (and in the information contained therein);

g. Orchestrating and devising a deliberate scheme which culminated in causing Darana and DESCO to breach the Consignment Agreement and undercut Sequel's pricing; and

h. Diverting and/or usurping business opportunities from Sequel and actively soliciting Sequel's customers, including but not limited to Darana, away from Sequel to DESCO.

79. Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**COUNT V – AIDING AND ABETTING OF BREACH OF FIDUCIARY DUTY**
**(Darana and DESCO)**

80. Border States incorporates each and every allegation above as if fully restated herein.

81. Mr. Gall held a fiduciary relationship with Sequel.

82. Mr. Gall, however, breached his fiduciary duties to Sequel by, *inter alia*, engaging in multiple intentional acts of disloyalty, including but not limited to the following:

a. Sending emails to DESCO and unfairly collaborating with Darana and DESCO prior to his resignation from Sequel;

b. Diverting significant business opportunities from Sequel to DESCO beginning prior to his resignation from Sequel;

c. Planning, conspiring, and plotting to leave Sequel's employment during company time and using Sequel's resources to recruit other Sequel customers and employees to leave Sequel and join Mr. Gall at DESCO;

d. Registering DESCO to do business in Mississippi and listing himself as its President prior to his resignation from Sequel;

e. Prior to his resignation, coordinating the opening of a new DESCO office in close proximity to Sequel in Oxford, Mississippi to compete with Sequel;

f. Improperly retaining and using Sequel's pricing information and customer lists (and in the information contained therein);

g. Orchestrating and devising a deliberate scheme which culminated in causing Darana and DESCO to breach the Consignment Agreement and undercut Sequel's pricing; and

h. Diverting and/or usurping business opportunities from Sequel and actively soliciting Sequel's customers, including but not limited to Darana, away from Sequel to DESCO.

83. Upon information and belief, Darana and DESCO provided Mr. Gall with substantial assistance and encouragement in connection with his breach of fiduciary duties.

84. Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**COUNT VI – UNFAIR COMPETITION**
**(All Defendants)**

85. Border States incorporates each and every allegation above as if fully restated herein.

86. Defendants unfairly competed with Border States by, *inter alia*, the following:

a. Mr. Gall and DESCO exchanged emails and unfairly collaborated with each other, and Darana, prior to Mr. Gall's departure from Sequel;

b. Mr. Gall, working in cooperation with DESCO, diverted significant business opportunities from Sequel to DESCO prior to Mr. Gall's departure from Sequel;

c. Mr. Gall, working in cooperation with DESCO, planned, conspired, and plotted to leave Sequel's employment during company time and utilized Sequel's resources to recruit other Sequel customers and employees to leave Sequel and join Mr. Gall at DESCO;

d. Registering DESCO to do business in Mississippi and listing himself as its President prior to his resignation from Sequel;

e. Prior to his resignation, coordinating the opening of a new DESCO office in close proximity to Sequel in Oxford, Mississippi to compete with Sequel;

f. Improperly retaining and using Sequel's pricing information and customer lists (and in the information contained therein);

g. Orchestrating and devising a deliberate scheme which culminated in causing Darana and DESCO to breach the Consignment Agreement and undercut Sequel's pricing; and

h. Diverting and/or usurping business opportunities from Sequel and actively soliciting Sequel's customers, including but not limited to Darana, away from Sequel to DESCO.

87. Defendants committed the above-listed actions maliciously and wantonly and intended to harm the business interests of Sequel.

88. As a result, Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**COUNT VII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(All Defendants)**

89. Border States incorporates each and every allegation above as if fully restated herein.

90. Sequel held business relationships and business expectancy interests with respect to certain prospective customers.

91. Defendants were aware of Sequel's business relationships and expectancy interests.

92. Defendants intentionally, improperly, and without legal justification, willfully diverted prospective customers of Sequel from doing business with Sequel.

93. Defendants' actions were done with malice and were calculated to cause damage to Sequel and its ongoing lawful business.

94. Defendants' actions were done with the unlawful purpose of causing damage and loss to Sequel, without right or legal justification.

95. As a result, Border States has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

**WHEREFORE**, Border States demands the following:

A. An order awarding compensatory damages in excess of $75,000, the exact amount of which will be proven at trial;

B. An order awarding reasonable costs and attorneys' fees pursuant to Article 13 of the Agreement;

C. An order awarding pre-and post-judgment interest at the contractual or statutory rate; and

D. Such other relief as the Court deems just and proper.

Respectfully submitted,

R. Lane Bobo, MSB No. 105263
Brunini, Grantham, Grower & Hewes, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
lbobo@brunini.com

*Attorney for Plaintiff Border States Industries, Inc.*